**HELENE CURTIS INDUSTRIES, Inc. v. SALES AFFILIATES, Inc.**

**GILLETTE SAFETY RAZOR CO. v. SALES, AFFILIATES, Inc.**

United States District Court
S. D. New York.

June 5, 1952.

Kenyon & Kenyon, New York City, for Helene Curtis Industries, Inc. Theodore S. Kenyon, New York City, Maurice S. Cayne, Chicago, Ill., John A. Reilly, Malvin R. Mandelbaum, New York City, of counsel.

Morgan, Finnegan & Durham, New York City, for Sales Affiliates, Inc. George B. Finnegan, Jr., Granville M. Pine, Charles H. Tuttle, Stuart H. Johnson, Jr., New York City, of counsel.

Fish, Richardson & Neave, New York City, for Gillette Safety Razor Co. Henry R. Ashton, New York City, Edgar H. Kent, Boston, Mass., Harry Pugh, Jr., Rynn Berry, New York City, of counsel.

Hawkins, Delafield & Wood, New York City, for Walgreen Drug Co. of Texas and Skillern & Sons, Inc. Clarence Fried, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Out of a rather involved situation has come the group of motions now before the court. Before setting the background of these motions, I shall first list them individually and ultimately dispose of them *seriatim.*

The Motions Before This Court

1. Sales Affiliates moves under Rule 56, Federal Rules of Civil Procedure, 28 U.S.

C.A., for summary judgment in its favor dismissing the complaint of Helene Curtis Industries, Inc. (hereafter referred to as Helene Curtis) in Civ. 71–280, a declaratory judgment action now pending in this district.

2. Helene Curtis moves:

(a) for leave to file and serve an amended complaint in Civ. 71–280 adding as a party plaintiff Helene Curtis Sales, Inc.;

(b) for an expeditious hearing of Civ. 71–280 under Rule 57, Federal Rules of Civil Procedure;

(c) for an injunction restraining Sales Affiliates from proceeding in Civ. 4605 in the United States District Court for the Northern District of Texas, Dallas Division and from intimidating customers of Helene Curtis by threats of commencement of suits against them for infringement of the patent in suit.

3. Sales Affiliates moves under Rule 56, Federal Rules of Civil Procedure for summary judgment in its favor dismissing the complaint of Gillette Safety Razor Company (hereafter referred to as Gillette) in Civ. 71–284 which is also a declaratory judgment action now pending in this district.

4. Gillette moves:

(a) for an injunction restraining Sales Affiliates from prosecuting Civ. 4606 in the United States District Court for the Northern District of Texas, Dallas Division and from intimidating customers of Gillette by threats and commencement of suits against them for infringement of the patent in suit;

(b) granting Civ. 71–284 a trial preference in this district under Rule 57, Federal Rules of Civil Procedure.

5. Walgreen Drug Company of Texas (hereafter referred to as Walgreen) and Skillern & Sons, Inc. (hereafter referred to as Skillern) move:

(a) for an order granting them leave to intervene in Civ. 71–284;

(b) for an order staying Sales Affiliates from proceeding in the Texas action, Civ. 4606 in which these movants are defendants, until the final disposition of Civ. 71–284.

6. Helene Curtis moves for an order referring Civ. 71–280 to a master under Rule 53(b), Federal Rules of Civil Procedure, the reference to include all motions previously made except Helene Curtis' motion to enjoin Sales Affiliates in its Texas suit, Civ. 4605.

7. Gillette moves for an order referring Civ. 71–284 to a master under Rule 53(b), Federal Rules of Civil Procedure.

History of the Patent in Suit

The patent in suit is No. 2,577,710. Application Serial No. 398,325 therefor was filed in the U.S. Patent Office on June 16, 1941 and the patent was finally granted on December 4, 1951, issuing in the name of Procter & Gamble as assignee. It covers a certain composition for so-called "cold" permanent waving solutions invented by Everett G. McDonough. All the parties appear agreed that cold permanent waves have revolutionized the mode by which the women of America, and, it is added, of most of the civilized world improve upon nature's bounty. The cold wave technique seems to have superseded an earlier "hot" wave method. An alleged quarter of a billion dollar industry has been built upon this new technique.

The history of the patent application is germane because of certain events which transpired during the course of its ten-year pendency in the Patent Office. While the patent application was awaiting disposition, McDonough assigned to Sales Affiliates the entire right, title and interest to the patent application. Thereafter, Sales Affiliates prosecuted it through the Patent Office.

On January 27, 1948, Sales Affiliates and The Procter & Gamble Company entered into an agreement under which Procter & Gamble agreed to pay "as advance royalties" the sum of $300,000. in exchange for certain benefits which included Sales Affiliates informing Procter & Gamble of its technical and promotional knowledge of cold hair-waving compositions. In this connection, Sales Affiliates issued to Procter & Gamble a non-exclusive license to make, use and sell hairwaving compositions under the patent application. The license embodied provisions for royalties to Sales Af-

filiates and gave Procter & Gamble a preferential royalty position as against any other licensees. The agreement further provided that in the event of an assignment to Procter & Gamble, "and during the period in which title is vested in Procter", Sales Affiliates was to retain the right to prosecute the application, to grant licenses consistent with the agreement, and to bring and defend suits on the assigned patent or application "in the name of Procter, if necessary, but at the expense of Affiliates, and [Sales Affiliates] shall be entitled to any recovery therefrom."

On July 22, 1949 these provisions were embodied in a mortgage assignment, to which Sales Affiliates and Procter & Gamble were signatories. By its terms Sales Affiliates assigned to Procter & Gamble the "entire right, title and interest" to the patent application until Sales Affiliates repaid the funds advanced to it under the January 27, 1948 agreement. The mortgage assigned, however, explicitly reserved to Sales Affiliates the right to grant licenses under the application as well as the rights to sue at its own expense as described supra. The assignment was duly recorded in the Patent Office.

By agreement dated June 21, 1951 the time for repaying the $300,000 was amended from January 21, 1951 until three years after the issuance of any patent on the application, but in no event later than December 31, 1954. The patent issued on December 4, 1951. Therefore the final date of repayment is three years thence. No part of the funds has as yet been repaid.

For some four years prior to the day the patent issued Sales Affiliates had been negotiating with Gillette and its predecessors in interest in The Toni Company (Toni is now a division of Gillette). The purpose of the negotiations was to obtain a license for the Toni business when the patent in suit should issue. Those negotiations continued after suit was commenced.

The course of affairs, both before and after issuance of the patent, is peppered with facts which indicate that the parties have been proceeding under some tension. The trade was informed by apparently neutral sources that litigation against infringers of the issued patent was a distinct possibility.[1]

There is evidence that the industry is in a very uncertain state at the moment.[2] This

---

[1] For instance, Bulletin No. 200 of the Beauty and Barber Supply Institute, Inc., dated April 14, 1952, and annexed to the affidavit of Henry R. Ashton, dated April 25, 1952, carried the following "Washington Report".

"Cold Wave Patents

"*Dealers Concerned About Stocks of Cold Wave Solutions*—On December 4, 1951, two patents were issued to Everett G. McDonough of Yonkers, N. Y., covering the manufacture, sale and use of 31 variations of a basic cold wave solution containing a mercaptan compound as the waiving agent. The patent numbers are 2,577,710 and 2,577,711. The first sets forth 18 variations of the solution and the second 13 additional variations, all of which are protected by the patent rights.

"Dealers who have stocks of cold wave solutions on their shelves are concerned as to whether some brands may be subject to the protection of the McDonough patents, and if so, what disposition they can make of these 'hot' stocks. If you have any stocks containing the mercaptan waiving agent, you are running the risk of an infringement suit if you sell it for hair waiving purposes, unless of course you purchased it from an assignee or licensee of the patent rights. It might be possible also to obtain permission from the owner of the patent rights to dispose of your stocks."

The article then goes on to give a thumbnail sketch of the litigation history of the patents.

[2] The second affidavit of Melvin Zimet, dated April 25, 1952, Assistant Secretary of Helene Curtis, attests that this Bulletin has a wide circulation among distributors and dealers in beauty shop products among whom are the most important customers of Curtis Sales. It also attests that the Beauty and Barber Supply Institute is regarded by the trade as occupying a position of neutrality. Attached to the further affidavit of Maurice Cayne, of counsel to Helene Curtis' attorneys, dated April 28, 1952, are three letters from Helene Curtis' customers in Madison, Wisconsin; Lancaster, Ohio and Kansas City, Missouri, which indicate that this article has caused genuine concern over a wide area of the beauty supply industry.

is recent history the origins of which reveal most clearly the atmosphere in which these matters have evolved.

From the abundant affidavits and exhibits before me[3], I cannot help but conclude that Sales Affiliates has behaved over the past years in a manner such that it has gained a reputation in at least some of the trade as a litigious organization. There is a ring of authenticity to the reputation, and the relevance of its litigiousness will presently appear in this opinion.

Even the patent application was not processed under completely harmonious conditions. It had originally been rejected by both the Patent Examiner and the Board of Appeals of the Patent Office, and did not issue until Sales Affiliates had prevailed in the District Court of the District of Columbia in a suit under R.S. § 4915, 35 U.S.C.A. § 63, to compel its issuance. Prior to the termination of that matter, the Patent Office had appealed the District Court's decision, but later agreed to dismissal of the appeal and allowance of claims somewhat modified from those ruled on by the District Court.

### Background of Litigation

On the day the patent issued, a rash of law suits broke out. These and the swift maneuvers following them are the complicating elements in the motions before me. Here in the Southern District Helene Curtis and Gillette each began their own actions (Civ. 71–280 and Civ. 71–284 respectively) for declaratory judgments declaring the patent invalid and that they were non-infringers. The suits were begun within a

matter of hours after the patent issued, with Helene Curtis filing its complaint in Civ. 71–280 (first among all litigants here), fifty-nine minutes after the patent had issued at noon of December 4, 1951. Gillette filed its complaint in Civ. 71–284 here at 2:20 P. M. of that day. Later the same day Sales Affiliates filed four infringement actions against seven defendants in the District Court for the District of Columbia (Civ. 5017–51,[4] Civ. 5016–51,[5] Civ. 5018–51,[6] and Civ. 5019–51).[7]

On February 15, 1952 Sales Affiliates answered and counterclaimed for damages in both actions pending here. The answers in substance alleged Gillette's breach of a confidential disclosure and Helene Curtis' attempt to prevent the issuance of the patent. Sales Affiliates served its instant motions for summary judgment (Motions 1 and 3) on that day.

On the same day in Washington several other matters occurred which did not relieve the growing snarl. Gillette, its three customers, and M. Wahl & Son moved the court there for transfer of those actions to this district pursuant to 28 U.S.C. § 1404(a). Gillette and its three customers answered the complaint in Civ. 5019–51 and thereby placed that action at issue. Sales Affiliates moved the court there for leave to add Procter & Gamble as "involuntary plaintiff" in all four Washington suits which had originally been filed in the name of Sales Affiliates alone. In addition, Sales Affiliates amended its complaint in Civ. 5019–51 as against Liggett, United Cigar-Whelan and People's to limit the charge of infringement

3. See, for instance, affidavit of Max H. Braun, Secretary of Helene Curtis, dated April 8, 1952 and affidavit of Raymond E. Reed, research and development director for Toni, dated April 2, 1952 and exhibits 1, 2 and 3 attached thereto.

4. Captioned: Sales Affiliates, Inc., Plaintiff v. Samuel Wahl, Max Wahl and Esther Wahl, comprising a partnership named M. Wahl & Sons, Defendants. This partnership is a distributor of the Helene Curtis products.

5. Captioned: Sales Affiliates, Inc., Plaintiff v. Harry I. Davidson, Defendant. Davidson is a customer of Caryl Richards, another manufacturer. Caryl Rich-

ards filed its own declaratory judgment action for a judgment declaring the invalidity of the patent in suit. That action was commenced here in the Southern District on April 8, 1952 but is not before the court in any connection.

6. Captioned: Sales Affiliates, Inc., Plaintiff v. Elizabeth Arden Sales Corporation, Defendant.

7. Captioned: Sales Affiliates, Inc., Plaintiff v. Gillette Safety Razor Company, Whelan Drug Co., Inc., Liggett Drug Co., Inc. and People's Drug Stores, Inc., Defendants. The last three defendants are Gillette customers.

to Gillette products although those three defendants also handle another product which is allegedly infringing and is one of the subjects of another infringement action in Texas. The manufacturer of that product, Gini Products, Inc. of Los Angeles, California, has offered to submit to the jurisdiction of this court, *infra*.

On March 3, 1952, Gillette replied to Sales Affiliates' counterclaim here, and on March 5, 1952 Helene Curtis replied to the counterclaim against it in its action here.

Thereafter on March 29, 1952, Sales Affiliates filed complaints in two infringement actions [8] in the District Court for the Northern District of Texas, Dallas Division. Walgreen and Skillern who move here to intervene (in Motion 5) are defendants in one of those actions, Civ. 4606. They are both important Gillette customers. In the other action, Civ. 4605, Sales Affiliates sues C. V. Layden, doing business as Southwestern Beauty Products. This organization is solely a distributor of Helene Curtis products.[9]

On April 3, 1952, Sales Affiliates filed notice in the Washington court of voluntary dismissal of its suit against M. Wahl & Son in Civ. 5017–51.

On April 7, 1952, Helene Curtis and Gillette each filed notes of issue placing their declaratory judgment actions on our trial calendar. On that same day, both Texas suits were set down for trial by the Texas court on July 2, 1952, before issue was joined. All three customer defendants in both those suits objected to this before issue was joined, but they did not prevail there.

On April 14, 1952 motions were served and filed in Washington to transfer Civ. 5018–51 and Civ. 5016–51 to this district.

On April 18, 1952 Gillette and Helene Curtis brought on Motions 2 and 4 here. On that same day in Texas, the answers in both actions were served, and Sales Affiliates made an ex parte application for a temporary restraining order against Gillette's *argument* on its Motion 4 here, but the application was denied by the Texas court.

On April 25, 1952 Sales Affiliates served a motion in Washington for leave to file a supplemental complaint against Gillette alleging Gillette's control of the defense of its three customer defendants in the Washington action, Civ. 5019–51, and for an injunction against Gillette's prosecution of its declaratory judgment action here. On that same day in Texas, Sales Affiliates served notice of two motions for hearing on April 28, 1952, for an injunction against Gillette's argument of Motion 4 here, and for leave to file a supplemental complaint alleging Gillette's control of the defenses of its customers Walgreen and Skillern who are movants in Motion 7 here. The Texas motions were heard on April 28, 1952 at which time the court denied the injunction application and granted Sales Affiliates leave to file the supplemental complaint. The supplemental complaint was filed on April 29, 1952 and alleged Gillette's control of the defense of Skillern and Walgreen, but it did not charge Gillette with infringement.

On April 29, 1952, I heard argument on the instant Motions 1, 2, 3 and 4. When they came before me that day, there was then pending in the District Court of the District of Columbia the battery of motions by defendants there to transfer Sales Affiliates' pending suits to its home district here in the Southern District of New York pursuant to 28 U.S.C.A. § 1404(a). Argument on those motions was heard by the District of Columbia court on May 1, 1952. While the initial motions here were awaiting disposition, Sales Affiliates notified the District of Columbia court by letter of May 7, 1952 of its voluntary offer to withdraw all ac-

8. Civ. 4605 captioned: Sales Affiliates, Inc., Plaintiff, The Procter & Gamble Company, Involuntary Plaintiff v. C. V. Layden, doing business as Southwestern Beauty Products Company, Defendant.

Civ. 4606 captioned: Sales Affiliates, Inc., Plaintiff, The Procter & Gamble Company, Involuntary Plaintiff v. Skillern & Sons, Inc., Walgreen Drug Company of Texas and Gillette Safety Razor Company, Defendants.

9. First and second affidavits of C. V. Layden, dated April 8, 1952 and April 16, 1952.

tions pending there. I received a copy of that letter to which I shall have occasion to refer *infra*.

On May 9, 1952 while Motions 1 through 4 were under consideration, Motions 5, 6 and 7 were served and filed.

On May 14, 1952 all the Washington suits were dismissed upon Sales Affiliates' motion.

On May 21, 1952, I heard argument on Motions 5, 6 and 7, and at that time the partnership Waval-Thermal of Burbank, California, and Gini Products, Inc. of Los Angeles, California, manufacturers respectively of "Nutri-Tonic" and "Pin-Wae" products, offered to submit themselves. to the jurisdiction of this court for the purpose of avoiding a multiplicity of suits. These two products are included in charges of infringement in the action brought by Sales Affiliates against Walgreen and Skillern, in Texas. The manufacturers of the products are not before the Texas court and jurisdiction cannot be obtained over them there.

Thus, after no real conclusiveness, some bitterness and much peregrination, these matters now stand before me in the form of seven motions.

## Motion 1

This motion by Sales Affiliates for summary judgment in its favor dismissing the Civ. 71–280 complaint of Helene Curtis is supported by two arguments which movant urges are conclusive against the maintenance of Helene Curtis' declaratory judgment action here. The arguments are that (1) Procter & Gamble is an indispensable party which has not and cannot be joined as a defendant in the action and (2) at the time the complaint was filed there was no actual or justiciable controversy between Helene Curtis and Sales Affiliates.

Is Procter & Gamble an indispensable party to Civ. 71–280?

The issues between Sales Affiliates and Helene Curtis are clear. Sales Affiliates' position is that Procter & Gamble holds more than a bare legal title and Sales Affiliates is not the true owner of the patent. In support of this, it is urged that Procter & Gamble has the right to sell the patent

or assume its earnings in the event there is a default on the loan. Proctor & Gamble's security right is stressed as giving the company the alleged right to deal freely with the title when necessary. Further proof against Sales Affiliates' equitable ownership is said to be its alleged restriction in dealing with the patent, particularly since it may grant licenses only in accordance with limits set by Procter & Gamble. It is also alleged that Sales Affiliates' right to sue on the patent is severely restricted. All of this, argues Sales Affiliates, negates the conclusion that Procter & Gamble holds bare legal title.

Helene Curtis' contra argument denies indispensability on grounds that by the terms of the instrument dated July 22, 1949 Sales Affiliates did not convey to Procter & Gamble the right to bring or defend suits on the patent; that Sales Affiliates reserved to itself the essential muniments of title; and that, in any event, the doctrine in A. L. Smith Iron Co. v. Dickson, 2 Cir., 1944, 141 F.2d 3, applies here to deny Procter & Gamble's indispensability.

What one portion of the July 22, 1949 "Assignment" instrument gives the following portion virtually takes away. A reading of the instrument urges such a conclusion, and the behavior of Sales Affiliates vis-a-vis Procter & Gamble demands it.

Paragraph 5 of the instrument begins with language assigning to Procter & Gamble "the entire right, title and interest in and to" the patent application until repayment of the "advance royalties" of $300,000 with interest. Then follow the clauses by which the original assignment of title, whatever abstract nature that may be, is sliced away with excepting provisions. By the excepting terms Sales Affiliates retains the right to conduct all Patent Office proceedings at its own expense. The right to grant licenses under the application is explicitly reserved to Sales Affiliates.

It retains the right to bring and defend suits on the assigned and reissued patents. It has the express power to sue in the name of Procter & Gamble if necessary, but at the expense of itself. Any recovery from such litigation belongs to Sales Affiliates.

The power which Sales Affiliates thus holds can be restrained only by loss of the patent on default of repayment or by the provision that in the event that it does not sue or license within three months after Procter & Gamble gives notice to it of an infringement, Procter & Gamble may then bring suit or license an infringer. This latter provision is in fact no check rein at all since it is completely a matter within the discretion and control of Sales Affiliates. There is no evidence that Sales Affiliates' virtual independence has ever been diminished by a notice from Procter & Gamble to sue or license, and there is abundant evidence that Sales Affiliates has so consistently been inspired by a zeal to litigate that the contingency of suit by Procter & Gamble seems unlikely in the extreme. To close one's eyes to the behavior of Sales Affiliates both before and after the signing of the instrument is to refuse a fair appreciation of the whole spirit in which this instrument was conceived and is being effected. The earlier statement of the background of litigation presents in only skeletal detail the frenetic and independent activities of Sales Affiliates. The apparently sovereign manner in which it has acted both in and out of litigation since the signing of the instrument is in no perceivable way different from its modus operandi before the signing.

The conception of Procter & Gamble as an indispensable party seems very clearly to be a Sales Affiliates afterthought completely devoid of any real merit. Recent history bolsters this conclusion.

The instrument was signed on July 22, 1949 and is still operative. Some two and one-half years later—December 4, 1951— Helene Curtis and Gillette commenced their actions here and Sales Affiliates began the four District of Columbia actions. (Between those dates Procter & Gamble appears to have been a most passive party in so far as Sales Affiliates was concerned). I have examined the four original complaints in the District of Columbia actions. A portion of the second paragraph of each contains the following language:

"Plaintiff [Sales Affiliates] is the owner by assignments duly recorded in the records of the United States Patent Office, of certain rights in United States Letters Patent No. 2,577,710, including the right to sue for infringement thereof and to recover damages therefor."

Not a word is said in any of the complaints about Procter & Gamble. Sales Affiliates held itself out as the owner of the patent

On February 15, 1952 Sales Affiliates served its answers to the Helene Curtis and Gillette complaints of December 4, 1951, complaints in which it was alleged that Sales Affiliates was the equitable owner of the patent and Procter & Gamble was not an indispensable party. Sales Affiliates' answers to those complaints were served on February 15 and they alleged the agreement, but denied that Procter & Gamble was not indispensable.

In Washington, on February 15, 1952 Sales Affiliates then moved under Rule 21, Federal Rules of Civil Procedure, for an order under Rule 19(a), Federal Rules of Civil Procedure, permitting it to add Procter & Gamble as an "involuntary plaintiff" in its four District of Columbia actions. Apparently Sales Affiliates submitted no affidavits or proof to support its allegation that Procter & Gamble declined to consent to join as plaintiff.

The pattern seems apparent enough. How could Sales Affiliates defend here on grounds of Procter & Gamble's indispensability when in the District of Columbia it had originally sued on the representation that it was the "owner" of the patent? Substantive consistency demanded that Sales Affiliates represent Procter & Gamble as indispensable *everywhere*. Anything less than such a representation would have been an anomaly destructive of Sales Affiliates' original defense here of indispensability, hence the motions to add Procter & Gamble as involuntary plaintiff in the District of Columbia had to be made to cover its flanks.

Counsel for Sales Affiliates wrote to Judge Bastian on May 7, 1952 following the argument before him on the District of Columbia motions to add Procter & Gamble as involuntary plaintiff. A copy of the letter was sent to me, and the language on page 2 of the letter is additional evidence

·that the assertion of indispensability is simply devoid of substance.

If there is merit to the claim of indispensability, I am unable to square that with the purely discretionary basis upon which Sales Affiliates can deliver or decline to deliver Procter & Gamble into the jurisdiction of the District of Columbia court. Were there a valid claim of indispensability, it would be grounded on the hard fact that Procter & Gamble, or judicial administration, has some genuine interest at stake here. "Indispensable Parties in the Federal Courts", 65 Harv.L.Rev. 1050 (April, 1952). I see no such interest on these facts.

■ Shields v. Barrow, 1855, 17 How. 130, 15 L.Ed. 158, stated the classic test for indispensable parties. They are "Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Yet these are precisely the kinds of factors which are *not* substantiated by Sales Affiliates. Instead, the unavoidable implication of their behavior seems to be that Procter & Gamble's real function is that of a mere mechanism—like a faucet—which permits Sales Affiliates to turn jurisdiction on or off.

■ I am convinced on the facts before me that Procter & Gamble's role here is not that of an indispensable party. The germane law leads me to the same conviction.

■ The grant of a patent right is the grant of the "right to exclude" and "This is all [the patentee] obtains by the patent." Bloomer v. McQuewan, 1852, 14 How. 539, 548, 14 L.Ed. 532; Continental Paper Bag Co., Eastern Paper Bag Co. (Paper Bag Patent Case), 1908, 210 U.S. 405, 425, 28 S.Ct. 748, 52 L.Ed. 1122. Its indicia here are the rights to sue or license infringers. Unquestionably, in this case those rights in any meaningful sense of the word were lodged in Sales Affiliates before the so-called assignment, and they lodge there now. The contrary conclusion—that they are really in Procter & Gamble—would not square with the facts.

Sales Affiliates argues the applicability of Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. The severe factual distinction between Waterman and the instant case forces me to disagree. In that case, plaintiff totally assigned to his wife the patent in suit, and thereafter she granted him "the sole and exclusive right and license to manufacture and sell * * * the said patented improvement". The wife then mortgaged the totality of her interests in the patent by assignment to a third party. The mortgagee was held indispensable. The exact point at which the distinction between Waterman and this case is clearest is found in the language of Mr. Justice Gray, who said, 138 U.S. at page 260, 11 S.Ct. at page 337:

"In analogy to the rules governing mortgages of lands and of chattels, and with even stronger reason, the assignee of a patent by a mortgage duly recorded, whose security is constantly wasting by the lapse of time, must be held (*unless otherwise provided in the mortgage*) entitled to grant licenses, to receive license fees and royalties, and to have an account of profits or an award of damages against infringers." (Emphasis supplied.)

But such indicia of indispensability are, as I have indicated, in the assignor here, and not in the assignee as in Waterman. This is one of the exceptional situations anticipated by the parenthetical words in the quotation. Applying the Waterman criteria, Sales Affiliates, and not Procter & Gamble, is found to be the indispensable party.

In Bakelite Corp. v. Lubri-Zol Development Corp., D.C.Del.1940, 34 F.Supp. 142, which is cited by Sales Affiliates, the defendant-owner of the patent was a Delaware corporation which granted an exclusive license to an associated company. The exclusive licensee was held not to be an indispensable party. To hold otherwise would, the court noted, give the patent owner a perpetual defense to declaratory judgment suits by granting an exclusive license

896

to an associated corporation inhabiting another district. As Judge Nields observed, 34 F.Supp. at page 144:

"It was not the intention of Congress to permit patent owners in patent controversies to avoid the application of the declaratory judgments statute."

Sales Affiliates' unstated and incorrect assumption in suggesting Bakelite as authority for its contention is that ownership is assumed to be in Procter & Gamble. The facts prove otherwise.

Curiously enough, there is a striking parallel between the immunization against suit aimed at in the Bakelite case and the immunization sought here by means of the instrument in question. The odd give-and-take provisions of the instant instrument have led to Sales Affiliates' argument that ownership as evidenced by the *granting* provision is really in Procter & Gamble which is indispensable and amenable to process only in its home forum in Ohio. Hypothesizing a declaratory judgment action in Ohio against Procter & Gamble, might that company not argue on the *excepting* provisions of the instrument that ownership is really in Sales Affiliates which is indispensable and amenable to process only in its home forum in New York? Judge Nields foresaw the possibility of just such an attempt at immunization in recognizing the alternative technique by which

" * * * the owner could keep an exclusive license and assign to the associated corporation title to the patents." 34 F.Supp. at page 144.

Sales Affiliates contends that even though Procter & Gamble has "granted" Sales Affiliates the right to sue on the patent, that does not affect Procter & Gamble's status as an indispensable party, for which it cites Crown Die & Tool Co. v. Nye Tool & Machine Works, 1923, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516. The case is inapposite. The patent owner there assigned to plaintiff Nye

"all the rights which it now has arising from said patent of excluding the Crown Die & Tool Company from the practice of the invention of said patent * * * but nothing herein contained

shall in any way affect or alter the rights of * * * [the patentee Reed] against other than the Crown Die & Tool Company". 261 U.S. at page 26, 43 S.Ct. at page 255.

That document, so uniquely different from the document here, was held not an assignment of the title to the patent, and thus Nye had no standing to sue Crown for infringement, citing Waterman v. Mackenzie, supra. Again the conclusion of the applicability of such a case collapses because the facts here negate Sales Affiliates' major assumption that it retained no significant muniments of title.

If Sales Affiliates' status were that of a bare non-exclusive licensee which was unauthorized to bring suit, I could comprehend the relevance of Contracting Division, A. C. Horn Corp. v. New York Life Insurance Co., 2 Cir., 1940, 113 F.2d 864, which Sales Affiliates asserts is the controlling decision in this circuit. Absent such a status, the case does not control. Indeed, the suit brought by the bare licensee for alleged infringement was dismissed because it did not even have the right to maintain such a suit. Surely the conduct of Sales Affiliates in Washington and Texas indicates that it acknowledges the power and right to maintain such suit.

A. L. Smith Iron Co. v. Dickson, supra, is the authority to which I adhere on the issue of indispensability. In that case the Cocks Company, a British firm, owned the patent in suit. It was not a party. Plaintiff brought a declaratory judgment action for a judgment of validity and scope against defendant whose rights and powers in addition to those of a licensee, included (1) the explicit power to grant licenses (as here), take royalties (as here) and (2) the power to threaten suit against plaintiff's customers (which is but one aspect of Sales Affiliates' power here). Under this latter authority, whether authorized or not by Cocks, defendant "meant the plaintiff to understand that he had such a power, and that he proposed to use it." 141 F.2d at page 5.

It was held that defendant's royalties and threats against unlicensed competitors made defendant and the patent answerable

to a claim for declaratory relief. The owner was held neither indispensable nor necessary.

Continuing the previous quotation, Judge L. Hand said, 141 F.2d at pages 5–6:

"Besides, he was issuing licenses to makers of the bands and taking royalties; nothing could be a clearer assertion of his purpose to insist upon a monopoly of their sale, and later of the manufacture of hatch covers. The plaintiff was therefore confronted with a direct attack upon its business. * * * The situation was therefore clearly ripe for a declaratory judgment as to the validity of the patent, and it was an error to dismiss this part of the complaint, unless the Cocks company was a necessary party to any judgment determining the validity of the patent. * * *

"* * * [E]ven though the Cocks company had done nothing more than license Dickson, the scales, so balanced, would tip to the plaintiff's side; for it would be obviously unfair to leave its business exposed to continuous indirect attack, merely to preserve the company's choice of forum—at least when, as here, the forum open to it is a court having jurisdiction over patents. But the case is stronger for the plaintiff than that, for the Cocks company went further than merely to license Dickson; it not only exacted a promise from him not to 'permit' its interests to be 'prejudiced,' but it has now authorized him to issue such licenses under its patent. It has plainly used him to enforce its patent, and if it has not surrendered its choice of a forum, at least its interest in that choice has dwindled too much to stand against the plaintiff's."

The facts here make out an even stronger case than those in the A. L. Smith case.

■ What I have said is not to be construed as a holding that Procter & Gamble will not be permitted to intervene if proper application is made therefor. Indeed, such an opportunity would be quite in order. But, this is *toto caelo* from holding it is an indispensable party, which I conclude it is not in this declaratory judgment action.

I turn now to the second theory on which the granting of this motion is urged. Movant asserts that at the time the complaint in Civ. 71–280 was filed there was no actual or justiciable controversy between Helene Curtis and it. It is further asserted that Helene Curtis is barred from maintaining the complaint because its hands are soiled.

■ Fifty-nine minutes after the patent issued on December 4, 1951 Helene Curtis filed its complaint. During that interval no statements were made by Sales Affiliates that Helene Curtis was infringing the patent.[10] This fact *in vacuo* is in sum and substance the basis upon which Sales Affiliates contends no justiciable issue exists.

In citing me to F. X. Hooper Co. v. Samuel M. Langston Co., D.C.N.J., 1944, 56 F.Supp. 577, Sales Affiliates destroys whatever remnant of strength there might be in its argument. The case, if it stands for anything, is authority exactly contrary to virtually everything in Sales Affiliates' position, and it is especially antithetical to the claim that there is no justiciable controversy in this case. Sales Affiliates' reliance upon Sanford v. Kepner, 3 Cir., 1952, 195 F.2d 387, is equally unavailing as authority for its theory.

Since 1941 Helene Curtis has built an extensive business in the manufacture, distribution and use of cold permanent waving solutions containing thioglycolic acid and ammonia,[11] ingredients which are also embodied in the patent in suit. I have made earlier reference to neutral reports of what was then a potential state of warfare in the industry. There were non-neutral reports as well, and these and

---

10. Affidavits of Ralph L. Evans, President of Sales Affiliates, dated February 15, 1952 and George B. Finnegan, Jr., an attorney for Sales Affiliates, dated February 15, 1952.

11. Affidavits of Max H. Braun, Secretary of Helene Curtis, dated March 28, 1952 and April 8, 1952.

their surrounding circumstances really indicate whether there is truly a justiciable controversy here.

On May 7, 1948 Sales Affiliates prevailed in an infringement suit brought against Helene Curtis (which was then known as National Mineral Company) in the District Court for the Northern District of Illinois, Eastern Division.[12] The two patents in suit there were so-called "machineless waves". On May 27, 1948 Sales Affiliates distributed to the trade an "Official Announcement"[13] portions of which read:

"Sales Affiliates, Inc., whose products include the well-known Zotos and Jamal Machineless and Lustron Cold Permanent Waves has won an important victory in a patent suit against Helene Curtis, Inc.

"On May 7, 1948. Federal Judge Michael L. Igoe handed down a Bench decision in which he held [the two patents in that suit] were valid and were infringed by Helene Curtis. * * *

"The full significance of this victory over Helene Curtis is appreciated when it is realized that damages in excess of $1,000,000 may be awarded to Sales Affiliates * * *.

"Further, a company official now states: 'Sales Affiliates owns a U. S. Patent Application [for the patent in suit here] which covers the use of mercaptans (such as thioglycolic acid) in cold waving solutions as formulated and used today in every cold waving composition and method now on the market'".

What is this if not a real indication to the entire trade that Sales Affiliates was girding its loins?

Neutral sources as well confirmed this. On May 29, 1948 in No. 16 of Volume 10 of "F-D-C Reports Drugs and Cosmetics", a trade paper for the cosmetics industry, the above press release was headlined:

"Announcing Victory in Machineless Wave Infringement Suit, Sales Af-

filiates Asserts Control in Cold Wave Home Kit Field. Says claims have been allowed in pending patent application 'covering every cold waving composition and method now on the market.' Has granted several licenses but doesn't say whether home kits are covered. Damages from Helene Curtis estimated at $1,000,000. page 6."

On page 6, where the full story was reported, there appeared the following opening paragraph:

"Sales Affiliates, Inc., owner of numerous patents in the permanent waving field, indicated this week that *the active enforcement policy which it has pursued in regard to machineless waves will carry over to the cold wave field, including home kits.* Counsel for the Company (Morgan, Finnegan & Durham) said that a pending patent application unquestionably covers all such products. It was indicated that all claims in the application have been allowed; apparently the issuance of the patent can be expected at any time." (Emphasis supplied.)

There is evidence that the italicized portion was regarded by the officers of Helene Curtis as a clear threat that when the application referred to issued into a patent, Sales Affiliates would bring an infringement suit against Helene Curtis.[14]

On July 15, 1948 Sales Affiliates sent out to the industry "An Open Letter to all Dealers Handling Machineless Waving Supplies" with an attached announcement which attempted an interpretation for the trade of the consequences flowing from the judgment of validity. Among other things, the announcement analogized the so-called invention to Edison's invention of the incandescent lamp and Bell's discovery of the telephone.

The judgment of validity upon which these reports were founded was reversed on February 7, 1949. Sales Affiliates, Inc., v. National Mineral Co., 7 Cir., 1949, 172 F.2d 608, certiorari denied 1949, 337 U.S. 940, 69 S.Ct. 1516, 93 L.Ed. 1745.

12. Max H. Braun, affidavit, March 28, 1952.

13. Ibid., Exhibit A.

14. Ibid.

Helene Curtis had other significant and unmistakable storm warnings in the months just prior to the issuance of the patent in suit[15] that it would be sued as an infringer when the patent was forthcoming.

Believing in the litigious nature of Sales Affiliates, and having these clear intimations of what was in store for it, Helene Curtis had a most genuine basis for commencing suit fifty-nine minutes after the patent issued. Remington Products Corp. v. American Aerovap, Inc., D.C.S.D.N.Y. 1951, 97 F.Supp. 644, affirmed, 2 Cir., 1951, 192 F.2d 872. Indeed this is the situation in which a justiciable issue is created at the moment the patent issues. Henry L. Crowley & Co., Inc., v. Philips Laboratories, Inc., D.C.1952, 104 F.Supp. 840.

I have examined with particular care the affidavits pertinent to Sales Affiliates' hearsay-riddled charge that an attorney for Helene Curtis conducted himself inequitably and illegally in certain Patent Office proceedings involving the patent in suit. I cannot make a determination on this issue based upon mere vehemence of affidavits. Upon the affidavits before me and the letter of the Solicitor of the Department of Commerce, dated April 23, 1952, I cannot accept with finality the validity of the serious charges made here. These charges must be resolved at trial by a full judicial determination on the merits. Furthermore, they are the basis for Sales Affiliates' counterclaim against Helene Curtis for $6,000,000 damages in Civ. 71–280.

Motion 1 is denied.

### Motion 2

■ In this motion movant initially seeks leave to amend the complaint in Civ. 71–280 to add Helene Curtis Sales, Inc. (hereafter referred to as Curtis Sales) as party plaintiff in Helene Curtis' declaratory judgment action here.

Curtis Sales is a Delaware corporation. Its sole place of business is in New York,

and from here it resells and distributes Helene Curtis' cold waving compositions. Curtis Sales also operates a cold permanent waving demonstration center in New York, where it uses the cold waving compositions in its demonstrations of new waving techniques. Customers at the demonstration center are charged for the permanent waves given there.

The infringement threats (discussed supra) and the suits which Sales Affiliates brought in the District of Columbia and Texas have affected not only competing manufacturers of the cold wave composition (e. g. Helene Curtis) but also distributors, resellers and users thereof. In so far as Helene Curtis is concerned, one of its customers, M. Wahl & Son, was sued by Sales Affiliates in now dismissed Civ. 5017–51 in Washington on the theory that its sales of cold waving solutions manufactured by Helene Curtis was an infringement of the patent in suit.[16] Another Helene Curtis customer, C. V. Layden, doing business as Southwestern Beauty Products, is a distributor of beauty products of which the Helene Curtis solution is one, and it is being sued by Sales Affiliates in the Texas action, Civ. 4605 for infringement of the patent in suit. The theory of that suit is that Southwestern Beauty Products is "using and selling" the Helene Curtis composition.[17]

The addition of Curtis Sales as a party plaintiff in Civ. 71–280 here is consonant with the holding that there is a justiciable issue as between Sales Affiliates and Helene Curtis. The issue between them is one in which Curtis Sales is very much a participant. The threats which Sales Affiliates laid down are as real a concern to Curtis Sales as to Helene Curtis. To this extent the issues of law and fact bound up in the original Civ. 71–280 complaint remain unaltered. In addition, Curtis Sales as a user and distributor of the competing and allegedly infringing solution brings into Civ. 71–280 the supplementary issues of whether the

15. Ibid., Exhibits D, E, F, G and H.

16. Affidavit of Max H. Braun, secretary of Helene Curtis, April 8, 1952.

17. C. V. Layden's affidavits of April 8, 1952 and April 16, 1952, indicate that Southwestern Beauty Products is only a reseller and in no way uses the composition.

patent in suit validly covers the distribution and sale of the Helene Curtis solution (the only question at issue in the Texas suit against Southwestern Beauty Products) and whether the patent in suit validly embraces the method utilized by a hairdresser in waving by means of the allegedly infringing solution. The issue as to method appears genuine since the patent in suit apparently includes method claims among others. The Texas suit against Southwestern Beauty Products apparently will not adjudicate this issue.[18]

To allow the amendment of the complaint will therefore bring within the ambit of Civ. 71–280 the totality of issues arising from this complex situation. As a matter of discretion, I deem it in the interests of justice to allow the amendment to the Civ. 71–280 complaint sought here.

Rule 15(a) of the Federal Rules of Civil Procedure provides in part:

"* * * [When an amendment to the pleadings is not made as of course] a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

■ Federal courts have consistently tended toward increasing liberality in allowing such amendments. International Ladies' Garment Workers' Union v. Donnelly Garment Co., 8 Cir., 1941, 121 F.2d 561; 3 Moore's Federal Practice (2d ed.) par. 15.08.

Rule 21 of the Federal Rules of Civil Procedure is also pertinent. It provides in part:

"Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

This again is a matter to be treated liberally and is within the sound discretion of the court. Messelt v. Security Storage Co., D.C.Del.1951, 11 F.R.D. 342.

■ When tested by these questions which were used in Jacquard Knitting Machine Co., Inc., v. Ordnance Gauge Co., Inc. D.C.E.D.Pa.1951, 95 F.Supp. 902—Will it prejudice the non-moving party? Will it serve to avoid multiplicity of suits?—this proposed amendment must be granted.

Sales Affiliates in these circumstances is not prejudiced by the allowance of the amendment. Its only fear in this respect seems to be that the addition of Curtis Sales "may be used as a springboard by plaintiff in its motion for injunction against the Texas action".[19] In granting the amendment, I wish to make clear that the entry of this new party plaintiff with the new issues it brings with it has not been the factor which has tipped the balance in any phase of the disposition of these matters. There are too many other items of substantial weight which have served that function. There is no prejudice to Sales Affiliates and there is the decided likelihood that multiplicity of suits will be avoided at least for the important reason that the method aspects of the patent in suit will be adjudicated in this action already brought, namely Civ. 71–280. This, if my reliance upon the C. V. Layden affidavit of April 16, 1952 be well founded, is not an issue on which an adjudication in Texas can be had in any event, hence Sales Affiliates has no basis for protesting it will be prejudiced on this score.

Helene Curtis is granted leave to file and serve an amended complaint in the form annexed to its motion papers, dated April 18, 1952, adding as a party plaintiff in Civ. 71–280 Curtis Sales of 745 Fifth Avenue, New York City, within 5 days after the order is entered hereon.

The second phase of Motion 2 is a prayer for an expeditious hearing of Civ. 71–280 and for advancing it on the calendar pursuant to Rule 57 of the Rules of Civil Procedure. This is treated in Motions 6 and 7, infra.

■ In the third and final phase of Motion 2 Helene Curtis seeks an injunction enjoining Sales Affiliates and certain others

18. See affidavit of C. V. Layden, April 16, 1952.

19. Defendant's Memorandum in Opposition to Plaintiff's Motion for Injunction, p. 2.

(a) from prosecuting the Texas suit Civ. 4605 in which Southwestern Beauty Products Co. is defendant until final adjudication of the present action, and

(b) from annoying harassing or intimidating customers or prospective customers, including beauty shops of Helene Curtis or Curtis Sales or other agents, distributors and beauty shop customers of Helene Curtis, by threatening or commencing suits for infringement of the patent involved in Civ. 71–280.

It is best at the outset of this discussion to recognize that there is no rigid rule running through the cases pertinent to this problem. We have instantly, and in a quite sophisticated form, precisely the kind of situation which if treated mechanically will frustrate, but if treated discriminately will strengthen the policy upon which the Federal Declaratory Judgments Act, 28 U.S.C. A. §§ 2201–2202, was formulated.

The limits within which a district judge is to treat such a problem were recently plotted in Kerotest Manufacturing Co. v. C–O Two Fire Equipment Co.; 1952, 342 U. S. 180, 183–184, 72 S.Ct. 219, 221. A district judge must give regard to "conservation of judicial resources and comprehensive disposition of litigation * * *. The factors relevant to wise administration here are equitable in nature." Discretion in such matters is of importance.

There are several factors which may valuably go to mold a judge's discretion. The order in which suits are commenced may be persuasive in favor of the first suit brought. Remington Products Corp. v. American Aerovap, Inc., supra; Hammett v. Warner Brothers Pictures, Inc., 2 Cir., 1949, 176 F.2d 145. In this case, Helene Curtis commenced its action here on December 4, 1951. Sales Affiliates commenced the Texas action on March 29, 1952.[20]

In F. X. Hooper Co. v. Samuel M. Langston Co., supra, it was noted, 56 F.Supp. at page 584:

"Indeed, in the case of Crosley Corporation v. Westinghouse Elec. &

Mfg. Co., 3 Cir., 130 F.2d 474 (certiorari denied 317 U.S. 681, 63 S.Ct 202, 87 L.Ed. 546), it was held that where one suit precedes the other by one day it was sufficient to attach jurisdiction to the court in which the prior cause was commenced."

The economic waste involved in duplicating litigation is to be avoided. Crosley Corp. v. Hazeltine Corp., 3 Cir., 1941, 122 F.2d 925, certiorari denied 1942, 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211; Kerotest Manufacturing Co. v C–O Two Fire Equipment Co., supra. By the grant of the second phase of this motion, the sole issue in the Texas case will be subsumed in a trial here, in addition to which the issue regarding the methods claim (which apparently cannot be tried in Texas) and the pending issue in Civ. 71–280 involving the manufacturer will also be resolved here. Finally, Sales Affiliates' counterclaim in Civ. 71–280 is pregnant with a serious issue which will be tried here. Thus, even if we assume for the moment that Curtis Sales and the issues it brings into suit will not be allowed to enter Civ. 71–280, that action nonetheless was commenced first and embraces a larger number of issues than the Texas action.

The problem of multiplicity is accentuated when we contrast the effect of the ultimate decree on the patent as between the Texas court and this court. If the Texas court were to enter a decree against the patent, Sales Affiliates would nonetheless be free to sue other customers handling Helene Curtis' composition. If, however, a decree against the patent were entered here, it would be *res judicata* as between Sales Affiliates and Helene Curtis—Curtis Sales. Such a decree would prevent future suits on the composition against Helene Curtis, Curtis Sales and any of their customers under the doctrine of Kessler v. Eldred, 1907, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065; Kerotest Manufacturing Co. v. C–O Two Fire Equipment Co., supra. If the Texas court were to enter a decree

20. Even if I take the commencement of Sales Affiliates' now dismissed Washington suit against Helene Curtis' customer M. Wahl & Son as the time at which Sales Affiliates commenced suit, Helene Curtis still retains priority.

in favor of the patent it would be *res judicata* only as to customers but not as to the manufacturer, Helene Curtis. Sales Affiliates would have to proceed directly against Helene Curtis in order to get a final determination as to its product. Such a decree, here, however, would be *res judicata* as to the manufacturer and would aid Sales Affiliates in any further suits against others.

But this is by no means the end of the catalogue of facts which weigh so heavily in favor of suit here rather than in Texas. The affidavit of John A. Reilly, an attorney for Helene Curtis, which is dated April 17, 1952, reveals the following information. Sales Affiliates, which is pressing the Texas suit, is a New York corporation which has no place of business in Texas. Its officers reside in the New York metropolitan area. Its records are kept here. The record of the ten year prosecution of the patent and the R.S. § 4915, 35 U.S.C.A. § 63, suit in the District Court of the District of Columbia indicate that Sales Affiliates named 26 New York residents who were said to have knowledge material to the question of the patent's validity. The affidavit continues at page 2:

"More than 50 additional unnamed chemists and beauticians working in and around New York are stated by [Sales Affiliates] to have records, documents, or knowledge of facts material to the present case. None of these witnesses are subject to the compulsory process of the Texas Court."

At the trial of the R.S. § 4915 suit, Sales Affiliates introduced the testimony of six witnesses who have important data bearing on the question of validity. Their testimony supported the claim that the patent should issue. Five of them live in New York; none of them is subject to the compulsory process of the Texas court, but all five are so subject in this court. The affidavit continues in this tenor. Furthermore, and as I have remarked earlier, Southwestern Beauty Products apparently does not use the Helene Curtis product (although that is one of the theories on which it is being sued in Texas). It says that it merely sells.

Sales Affiliates' reply (by way of its brief) to the affidavit in no way contests the truth of its content, but instead says, in effect, that such matters are of no concern to Helene Curtis since it is not a party to the Texas action. In these circumstances this is a hollow rebuttal.

The truth of the matter is that this affidavit adds one more reinforcing increment to my conviction that Sales Affiliates is forum shopping with a vengeance. I discern no other rationale which can adequately explain the stratagems which it has employed throughout this controversy. Our courts are not meant for such use.

On the uncontested facts, there is nothing to be gained by a trial in Texas rather than here, and there is much which commends the conclusion that this forum will best serve the ends of justice. The contrary conclusion is not only a defiance of fact but a subscription to the sporting theory of justice as well.

An injunction will issue. The only question is its scope. The first phase of the application prays for an injunction enjoining Sales Affiliates and others from prosecuting its Texas suit against Southwestern Beauty Products. As matters presently stand, this court is not competent to issue such an injunction. C. V. Layden, doing business as Southwestern Beauty Products, is the defendant in the Texas action but is not a party to this action. Yale & Towne Mfg. Co. v. Manning, Maxwell & Moore, Inc., D.C.S.D.N.Y.1950, 91 F.Supp. 106; Cresta Blanca Wine Co. v. Eastern Wine Corp., 2 Cir., 1944, 143 F.2d 1012; Crosley Corp. v. Hazeltine Corp., supra; Triangle Conduit & Cable Co. v. National Electric Products Corp., 3 Cir., 1942, 125 F.2d 1008, certiorari denied, 1942, 316 U.S. 676, 62 S.Ct. 1046, 86 L.Ed. 1750; Crosley Corp. v. Westinghouse Electric & Mfg. Co., 3 Cir., 1942, 130 F.2d 474, certiorari denied, 1942, 317 U.S. 681, 763 S.Ct. 202, 87 L.Ed. 546; Hammett v. Warner Brothers Pictures, Inc., supra.

Layden has offered to submit to the jurisdiction of this court. If the offer is tendered formally and unconditionally that C. V. Layden, doing business as Southwestern

Beauty Products intervenes as a party plaintiff in Civ. 71–280, it will be so ordered by the court. Immediately thereupon, an injunction will issue restraining Sales Affiliates from prosecuting or taking any further steps in the prosecution of Civ. 4605 in the United States District Court for the Northern District of Texas, Dallas Division, in so far as Helene Curtis' products are concerned until the final disposition of Civ. 71–280 here in the Southern District. Since this court does not have jurisdiction over Procter & Gamble, a fortiori no restraint is placed upon it in the Texas suit.

The second phase of this application prays for an injunction enjoining Sales Affiliates from annoying, harassing or intimidating customers or prospective customers, including beauty shops of Helene Curtis or Curtis Sales or other agents, distributors and beauty shop customers of Helene Curtis, by threatening or commencing suits for infringement of the patent in suit Civ. 71–280. This aspect of the motion for an injunction is denied at this time. Because of the ultimate disposition of these motions, there is the distinct possibility that both Civ. 71–280 and Civ. 71–284 will proceed to trial with dispatch. In the light of this, the instant aspect of this motion in its specific applications can be fully determined on the merits at the trial. It is likely that irreparable injury will not result with respect to this aspect of the case between now and the imminent trial. Of course, applications to stay infringement actions brought between the date hereof and the commencement of the trial may be made in the proper case.

### Motion 3

In this motion Sales Affiliates moves for summary judgment in its favor dismissing Gillette's complaint in its declaratory judgment action here, Civ. 71–284. The grounds upon which the motion is brought are precisely those underpinning Motion 1.

Having carefully analyzed the abundant file covering this motion, I am of the opinion that Sales Affiliates has no more proved its assertion of Procter & Gamble's indis-

pensability here in Civ. 71–284 than it has in Civ. 71–280.[21] Furthermore, there are even more data here than in Civ. 71–280 to indicate that indeed a justiciable controversy existed at the time this action was commenced.

Here, as in Motion 1, Sales Affiliates makes charges that its adversary has come before the bar with unclean hands. The basis for this allegation is factually distinct from that made against Helene Curtis, yet there is the common element that in both cases the charges cannot be accepted on the paper proof offered. The charges made against Gillette, like those against Helene Curtis, can be resolved with propriety only after a trial. Likewise, as in the case of Helene Curtis, they form the basis of Sales Affiliates' counterclaim against Gillette, and this will have to be decided upon the trial of Civ. 71–284.

Motion 3 is denied.

### Motion 4

Gillette moves for an injunction restraining Sales Affiliates and certain others from

(a) prosecuting or taking any further steps in the prosecution of Civ. 4606, the Texas suit in which two of Gillette's customers (Walgreen and Skillern) are defendants until the final disposition of Civ. 71–284;

(b) harassing, annoying or intimidating customers or prospective customers of Gillette by threatening or commencing suits against them for infringement of the patent in suit.

It further moves for a trial preference, which is treated in Motions 6 and 7.

The earlier discussion in Motion 2 of the factors applicable in a problem such as this obtains equally in the consideration of this motion for an injunction. In dealing conclusively with this problem, these seem to be the crucial facts. Gillette brought its suit before Sales Affiliates (again this being true whether priority be measured by Sales Affiliates, dismissed Washington action or by its pending suit in Texas). What of the issues as between suit here and in Texas? In Texas, the suit is based on in-

---

21. See Motion 1.

fringement by use and sale. Affidavits before me [22] indicate that use may be a false issue. At any rate, if both issues are genuinely in the Texas suit, they nevertheless appear here, as does the issue of manufacturing. Gillette although joined as a defendant in the Texas action is a party thereto only on the issue of its alleged control of the Skillern-Walgreen defenses and not as to manufacturing.

Here there are the further issues of Gillette's manufacture of the allegedly infringing product and Sales Affiliates' counterclaim against Gillette's allegedly inequitable behavior. It is most clear that all of the issues springing from the patent in suit are pending decision in this forum. The same principles regarding a decree here as against a decree in Texas which apply in Civ. 71–280 are equally applicable in this instance. A decree here would resolve all the issues and obviate multiplicity where a decree in Texas would not.

From the standpoint of the convenience of parties, witnesses and access to the sources of proof [23] the balance is overwhelmingly in favor of this court rather than the Texas forum.

Because of these considerations and those discussed upon the disposition of Motion 5, Sales Affiliates is hereby enjoined from prosecuting or taking any further steps in the prosecution of Civ. 4606 in the United States District Court for the Northern District of Texas, Dallas Division, against Gillette, Walgreen and Skillern, [24] in so far as the Gillette product is concerned until the final disposition of Civ. 71–284. Again, no restraint is placed upon Procter & Gamble since it is without the jurisdiction of this court.

That portion of the application which seeks to restrain Sales Affiliates from annoying, harassing or intimidating customers or prospective customers of Gillette by threatening or commencing suits against them for infringement of the patent in suit is denied on the same basis embodied in the denial of this phase of Motion 2.

### Motion 5

Walgreen and Skillern move under Rule 24 of the Federal Rules of Civil Procedure to intervene here in Civ. 71–284 and for an order staying Sales Affiliates from proceeding in the Texas action, Civ. 4606, in which Walgreen and Skillern are defendants. The ground upon which the motion is sought is that movants have a substantial interest in the subject matter of Civ. 71–284 and common questions of law and fact exist with respect to their claim and Civ. 71–284.

Movants are Texas corporations operating chains of drug stores in which the hair waving products of Gillette and other manufacturers are sold. The basis for the action against them in Texas is that they have allegedly infringed the patent in suit by selling the hair waving products of Gillette and two other manufacturers: "Nutri-Tonic" products of the Waval-Thermal Company, and "Pin-Wae" products of the Gini Products, Inc. These last two manufacturers are California corporations which are not subject to suit in Texas and are not present before the Texas court, although their products are there charged to infringe. Each has indicated by affidavit its willingness to submit to the jurisdiction of this court. I shall not pass upon such informal indications. If Waval-Thermal Company and Gini Products, Inc. desire to pursue this, the applications should be made in a formal manner, upon notice to all interested parties.

The arguments advanced in favor of the motion are that trial here will avoid a multiplicity of suits and this district is the most convenient place for it. In so far as multiplicity is concerned, the total situation is such that a trial in this forum is clearly the way to an economy of litigation.

22. Affidavit of Herbert Davey, District Manager of all Walgreen Stores except that in Beaumont, Texas, dated April 16, 1952.
   Affidavit of George B. Kelly, Secretary and Comptroller of Skillern, dated April 16, 1952.

23. Printed affidavit of Carl J. Gilbert, Vice-President and Treasurer of Gillette, dated February 13, 1952.

24. Intervention being granted in Civ. 71–284, Motion 5, infra.

As I have indicated, this is true for both the Gillette and Helene Curtis actions here. The instant motion is for intervention in the Gillette action, hence the focus is on that point for the moment.

The arguments in opposition do not defeat the considerations which lead to the granting of the motion.

It is first said in opposition that the motion is made "to induce this court to cut in ahead of the [Texas] trial fixed for July 2, 1952." To answer this charge effectively, it is necessary to keep continually in mind the genesis of that suit (as well as the companion suit against Southwestern Beauty Products). It is also necessary to remember what it is that is being "cut in" on.

The Texas trial will come to fruition only because substantially the same issues there were pending in the Washington suits but were aborted by Sales Affiliates' voluntary dismissals. Having tried the Washington forum and found it wanting, for whatever reasons Sales Affiliates saw fit, it is in the Texas forum for yet another turn at litigation. It seems inequitable in the extreme to our courts as well as to opposing adversaries to permit Sales Affiliates to shop in forums until it can choose one in which it can find something to be used as a lever to dislodge what would otherwise be an orderly and inclusive judicial procedure elsewhere. That is what is attempted here. The Texas trial date of July 2 is the lever. It is a date based, I assume, on the fact that the calendar of that court is virtually up to date. I full well appreciate the need for expedition, and a proper forum in which this can be had is a valid concern of a patentee. But the condition of a court calendar is not and cannot be the sole criterion for deciding an appropriate forum in a complex context such as this. The date July 2 is essentially all that is unique about the Texas action. It embraces no issues which are not covered here, and considerably fewer. In spite of the fact that defendants there are residents of Texas, it is still most apparent that convenience of trial is here and not in Texas. In any such suit, the patent is the prime issue, and virtually all the sources of proof thereon are in metropolitan New York. Most of the possible witnesses are in this area and are not subject to the compulsory process of the Texas court. Sales Affiliates' headquarters are here. Procter & Gamble's interest in the patent is before this court to exactly the same extent as it is before the Texas court, since the "Assignment" authorizes Sales Affiliates to bring and *defend* suits on the patent. Nothing bars Procter & Gamble's entry here. It has been invited to intervene here, and the door remains open.

Rapidity with which trial will be reached then is the only unique factor in the Texas action. And if the trial is had, the issues it will resolve, irrespective of who prevails, will leave untouched the major issues which are here, and thus the warfare will continue essentially unabated. This is all that is being "cut in" on.

If an early trial were the crucial test, then in virtually every instance the Southern District of New York would be ousted of its jurisdiction, and this could occur in situations in which prior suit was commenced as much as several years ahead of succeeding suits. This is so because the calendar for non-jury cases in this district is approximately 29 months behind. I do not read the Kerotest case as authority for placing undue stress upon a prior trial date. Indeed, Mr. Justice Frankfurter speaks of the "equal start in the race to the courthouse" for the commencement of suit rather than trial.

The rights afforded by the Federal Declaratory Judgments Act would have little meaning in this district if trial date were the criterion in matters such as this, for on most occasions when another proceeding was pending in a foreign jurisdiction, a trial here could never be had. These are considerations which cut both ways. It is not difficult to imagine the situation in which the patentee, having anticipated the alleged infringer by many months, would, despite having won "the race to the courthouse" lose it simply because the calendar in another district affords the latecomer an earlier trial.

Sales Affiliates urge that if intervention is allowed it will possibly result in so much time consumed in pleading that July 2 will

have come and gone. If intervention pleadings do consume that much time, it will be "wasted" time which is really a saving in the long run. The intervening complaint will be filed and served within 5 days after the order is entered hereon.

Cresta Blanca Wine Co. v. Eastern Wine Corp. supra, did not present a situation factually akin to the instant one. There is no indication that the competing actions there arose from a context such as this. I believe the instant situation calls for an exercise of discretion based upon distinctively different factors than those in the Cresta Blanca case. Indeed, that case well recognizes that a proposed complaint of intervention for declaratory judgment is addressed to the court's discretion. As a matter of discretion, I hold that Walgreen and Skillern may intervene. The motion to intervene is granted. The aspect of this motion to grant a stay is mooted by the injunction granted in Motion 4.

## Motions 6 and 7

■ Helene Curtis and Gillette each move for a reference of their respective declaratory judgment actions to a master upon grounds that exceptional conditions herein require such a reference within the meaning of Rule 53(b), Federal Rules of Civil Procedure.

As I have sought to indicate throughout this opinion, the situation here is exceptional. It is most intricate, of some economic consquence, and it presses for solution. An entire industry is disrupted. All parties stress the urgency of expedition, and the most insistent in this respect has been Sales Affiliates. It is difficult to reconcile its frequent allusions to an early trial in Texas with its opposition to the motions for a reference providing for an early trial in New York. Any contention that Sales Affiliates prefers a trial by a judge of the District Court rather than by a master is rather empty of substance in view of the suggestion made by this court that a former Federal Judge, possessed of vast experience, learning and ability would be considered for appointment as a master.

Protests that costs of the reference will be substantial dissolve when we consider the financial standing of the parties in litigation and the huge stakes involved in the outcome. If the patent in suit be valid, then every passing day in which this is not yet judicially determined sees infringement damages mounting in amounts far out of proportion to any possible costs of reference. If it be invalid but judicially undetermined, daily losses mount in the business of competing products because of the uncertainty which exists. Again such losses would be far in excess of reference costs.

Perhaps Sales Affiliates has been prompted in its opposition to the motions for the reference to a master in the belief that consent to such a reference would lead this court to treat too hastily the motions to stay the trial in Texas. It might have labored under the erroneous impression that its consent to the appointment of a master would in effect destroy its argument that it could not obtain an early trial in New York whereas it could in Texas, and that a fortiori such consent would quite automatically lead to a stay.

However, by rulings this day these battle tactics are transformed into mock warfare. Sales Affiliates' continued opposition to the reference, and thus an early trial in New York, places it in the anomalous position of vociferously urging an early trial in Texas so that the issues may be resolved while simultaneously opposing an early trial in New York where not only the Texas issues but much more comprehensive ones may be determined.

Even if a trial preference were to be granted in this district by the Chief Judge (to whom the two applications herein should be made[25]) the state of our calendar is such that a trial before the autumn is impossible. To put off decision until then will only seriously aggravate business losses or infringement damages. A reference is the obvious way to a just and reasonable solution of the problem.

In view of what I have said on the motions for a reference, and particularly in the light of my decisions on the related mo-

---

25. Rules 2 and 11, Calendar Rules, Southern District of New York.

tions, there is afforded to every party a period of five days from the date of the filing of this opinion to advise the court in writing of its willingness to consent to the reference.

C. V. Layden, doing business as Southwestern Beauty Products is given five days from the date hereof to file and serve his consent to submission to this jurisdiction and to file and serve his intervening complaint.

Settle order embodying the decisions reached.